Good morning, justices, counsel, Mr. Gaines, Dennis Noble on behalf of the employer Hilton Chicago O'Hare. This is a very interesting case, both factually and legally. Mr. Amprim was employed previously for a company which he also filed a claim for application of benefits against. The case was litigated and tried in front of a different arbitrator in February of 2006. The decision in that case was that Mr. Amprim was an odd lot permanent total based on the fact that he couldn't find work within a reasonably stable job market, based on his job search of 60-plus employers who wouldn't hire him because his need was so bad that he ended up in the emergency room every time he tried to work. Well, three months after that trial, he got hired by my company, the hotel, and he was hired in the laundry department. Within a month of his employment, he sustained an injury to the same body part that he had previously been adjudicated an odd lot on his left knee. The accident wasn't witnessed. He went to the clinic Concentra, which they send their employers to. There was a question early on whether or not there was any specific trauma to the left knee. As of May, Dr. Silver took over his care and treatment, performed an arthroscopic surgery on the left knee. After therapy, he was subsequently discharged MMI to full duties in October and again in December of 2006. Now, the interesting part was after his injury, they did a routine drug test, which was part of the union agreement, and he failed that test. Therefore, the hotel would not hire him back. Now we've got a gap in time from that full work released by Dr. Silver until he was seen again at counsel's request by the prior surgeon who had performed the surgery in the earlier case that had found him an odd lot per total. That doctor provided opinions that he felt the injury aggravated the knee and potentially aggravated or accelerated some arthritis. What that doctor didn't know clearly from his testimony in the cross-examination and his evidence deposition was that Mr. Amprin testified in the 2000, I'm sorry, in the 2006 arbitration hearing that he couldn't do a variety of things. Basically, he was so limited by his knee condition that he couldn't tie his shoes, couldn't carry children or grandchildren, couldn't go grocery shopping, had to use a cane at all times to ambulate. Now we go back to when he was hired by us. I provided his signed preemployment information where he said he was capable of performing the jobs as a laundromat based on these, the push-pull requirements, kneeling, squatting, et cetera. Clearly, his testimony contradicts what he signed. So either he had a miracle cure in the three months before he was hired by us, or he was lying then, or potentially lying now. Well, can I assume for a moment that he was lying in the prior arbitration? How is that relevant in this case? Well, I guess you're right. My point being, I don't see you want to convict us he's a bad guy. Exactly. I'm questioning his credibility to a large extent. There's a lot of surveillance video in there which really contradicts some of his claims of disability. But he did go to work for you, didn't he? He worked for a month, yes, sir. And he worked for one month? Yes. Didn't work operating with a cane or anything else? He worked? No. Okay. But that was contrary to his testimony before where he said he had to ambulate with a cane in the prior hearing all the time. We know. Okay. He testified in the prior hearing he couldn't walk without a cane. He lied. The fact of the matter is he went to work for you and did in fact work without a cane for a month. All right. So then we jump ahead to the full work released by Dr. Silver, which the commission pretty much ignored. They focused on some 2007 evaluation by Dr. Goldberg who said that his condition changed or worsened as a result of the accident. Dr. Silver did the surgery. Dr. Silver listened to him. Dr. Silver released him to full duties. Who was the claimant's treating physician? Dr. Silver. Who's Dr. Mercier? I'm sorry. I'm saying the wrong physician. I apologize. Silver Mercier. Yes. Did Mercier release him to, did Mercier opine he reached MMI? Yes. And when was that? October of 2007. So that's your argument that he should have been terminated then, right? Well, he went back again with complaints in December of 2006, at which time he was released again. So I originally argued the October 2006 was the MMI. Right. Now... Are you changing that argument? No. I'm just saying he went back again and got released again, showing that Dr. Mercier believed that he was capable of returning to work. He was released right to the work in September. Well, the interesting part is the commission awarded TTD benefits all the way back to the date of loss through 2008, at which time Susan Enberg provided her first report. There's no evidence of disability during that time period. At all. There's no evidence that he looked for jobs during that time, which would allow him to recover for maintenance. And Susan Enberg sees him in 2008 and says, well, I don't think he's employable in a reasonable, stable job market based on his physical condition and his education and background. And subsequently in 2009, after an evaluation by Charles Bush Joseph, she says, well, if there's work available within his prior occupation in laundry in the hotel, and he can do that, otherwise you have to do a job search or a vote placement. Excuse me. I'm trying to see if I can call off the essence of the argument. Obviously, I thought you were arguing that the commission's finding that the claimant was entitled to TTD between September 2006 and August 2008 was against the manifesto of the evidence because he was released by his treating physician. Correct? Correct. That's still your argument, right? Yes. Well, let me ask a question. If we were to agree with you that he was not entitled to TTD after September of 2006, but disagree with you on the question of whether he was a total permanent, the only thing we'd do is back up his maintenance all the way to September of 2006. And to you, that's six of one and a half a dozen of another because it's the same amount of money. It is the same amount of money, but what do we base the maintenance on because he wasn't looking for work? He's a total permanent. Well, he's an odd lot based on what? He did a search. Just like he did before. And Ettenberg says he might be employable if he had voc rehab. You offered him none. We didn't offer him voc rehab because he was released to full duty. Well, he was released to light duty and he had restrictions, didn't he? No, he was released to full duty. By who? Mercier in December of 2006. Let me see what Mercier said. Had to learn to live with his, he had aggravated it. Your appearance was released to light duty, is this correct, by Mercier on September 13, 2006? Right. To full duty on October 10, 2006, right? Yes, excuse me. He released him to full duty. Well, the decision. What did Ettenberg say? Ettenberg, based on his subjective complaints, Ettenberg didn't even know, it's clear from her reports, even though she was engaged in the first case, she didn't render a report. She did have all the documentation from the first case sent to her like it was in our case, the second time around. What Ettenberg said is the first time around said he was otherwise unemployable and was a candidate for vote placement. The second time around, Bush Joseph evaluated him and said he was back to where he was before and she said she would agree that he could return to work for the hotel if that type of work was available. He didn't look for work after that. And he came in with a job search, and what happened then? The job search was tendered on the day of the arbitration hearing. Right. Well, did you introduce any testimony that contradicted Ettenberg at all? Did you submit any evidence to contest that? Well, there was evidence to, well, I was looking at the Weston decision and focusing on Ettenberg. As I agree, the Weston decision says if you don't have a job search or a vote placement report, you're really not going to be an outlaw. But in this case, I think the focus is was the job search legit? Now, we could argue back and forth whether that was hearsay. I didn't know she left out, too. Bush Joseph put restrictions on this guy, didn't he? Well, he was back to where he was before. But Bush Joseph indicated he was at MMI and he was able to work with a 40-pound lifting restriction and should avoid repetitive squatting, kneeling on his left knee. Exactly where he was before, except for a 20-pound increase in his lifting restriction. But the problem that you have is now along comes Ettenberg, who says she's reviewed all of this and, you know, he might be able to get a job, if it's available, to get a job outside of this janitorial service that he was working at or laundry service. He's got to go through work rehab, and you didn't offer him. No, because he was released to full duties. When you say he was released to full duties, yes, he was. He was released to full duty, but with restrictions. But you have to grasp the entire evidence. This is not a case where he was pristine walking in. If his condition was, as he testified to in the 2006 case. Look, if you want to say that this case is a poster child as to why an employee ought to be able to search workers' compensation records to find out what condition their prospective employers are in, you're 100 percent correct. But you're not allowed to. Now, there's no exemption in this statute for somebody who lies to you, you hire, and then is injured. You're stuck with them. Exactly. Okay, I'm going to go to the Weston decision again. The job search is one thing. Did he meet his burden there? He offered the document that supposedly his family wrote, his sister wrote, somebody wrote. He didn't even know what year it was from. It was in 2000 and maybe 2008, maybe 2009. That's two to three years after he was discharged in 2006. There was nothing in between to show that he had looked for work. The only thing that you had to do to overcome his prima facie showing of an odd lot is introduce evidence of the existence of a job. And you didn't. But didn't Edinburgh say there was a he was employable in his prior occupation? In his prior occupation, there was only one problem. There was no job for him in his prior occupation. Because he was termed for drug use. Well, no, no. It was the job at your place. Right. But he comes up with a job search that's within his restrictions, evidently, and says I can't find a job. I can't get a job. And the only thing that you had to do to avoid the odd lot was to come up with evidence and say he could have a job and here's the job he could have. It wasn't refuted. You didn't refute his argument. You didn't refute it. It became your burden. Well, the burden shifts only if he proves both elements or one of the elements. He offers a job. He obviously proved it because the commission gave him an odd lot. So they believed it. Commission rubber stamped the arbitrator's decision. There was no comment. As they do in almost every case where they're affirming and adopting. Within two weeks. There's no suggestion that they didn't read the evidence. There's no suggestion that they didn't read it. So the arbitrator gives him odd lot, which necessarily means he believed that he performed a job search and couldn't get a job. At that point, the burden shifted to you. The only thing he had to do was bring in evidence that there was a job for him. Well, the evidence came out of his own mouth. He was working for his brother. He also had worked for the Lakewood facility for five to six months. This guy was transient before he worked for us. He's transient now. He was transient after the hearing. What could Zettenberg's report if he went out and got his own job anyway, for whatever means, in the same type of work he always did, which was transient nature? This gentleman worked a grand total of six months in seven or eight years. The problem is you went all in on the theory you're going to be able to point out, and extensively of reasons, as to why his case was flawed, why his credibility is not worthy of belief, et cetera, et cetera, and pick apart his case. But when you had the opportunity to come forward with evidence to refute that, you didn't do it. That's the problem. You can point to all of the flaws in his credibility in his case. But if the commission believes him and there's nothing in the evidence to refute that, you have a problem. I don't disagree with you. However, if he has a release MMI full duty by the treating physician, why do you offer him voc rehab two or three years later? That defies logic, in my opinion. What's he done in the last two or three years? We don't even know what he's done the day after he left the hotel for the last time. Didn't he testify as to his job search? It was pretty limited, if I recall. He testified for 50 jobs between October 17th, 2007 and April 28th, 2009. That's what he testified to. But when the document was first introduced in under Cross, he didn't even know what year it was. And then he admitted he didn't do most of the writing. Then he backtracked and said he did none of the writing. And he was driving around. And relying on picking apart his case. I know. I know. But if that's the only evidence to hang an odd lot on, that's not very credible evidence, in my opinion. Well, that's his job search. But it was the same before. I guess the question I have is, and this is 25 years of doing this, I've never seen a case like this. It definitely is a different kind of case. I'm not saying he can't be odd lot twice, but I'm saying what changed from the first case to the second case? He was able to work for us for a month. He had an injury. He had surgery. He got released. Then we go back to his old doctor, and he says, oh, well, now he's got new injuries. And now all of a sudden, months or a year later or two years later, he's out looking for work? That's what he did before. That's why we hired him. The lesson here is your argument has some intuitive appeal. But, again, keep coming back to the fact that you were confident his case would not carry the day. It was ridiculous. And yet if you don't present any evidence to refute it, you're really taking a big risk. Are you not? It was. I'll be honest. When the demand for voc rehab was made in 08, I, counsel, I discussed it. I said I'm not offering it to him because he was released from work. That's what I'm holding my hat on, to be honest with you. I understand. Because at that point, it's two years post full work release. Now I'm looking at a case where now I learn about his prior decision. I get his transcript. I'm reading it. And this guy can't tie his shoes. And I remember talking to counsel. I said, why am I going to invoke a guy who can't tie his shoes? He testified to the same stuff in that case as he did in our case. Why would you invoke him? Just because Susan Emberg gets retained a second time that says he's a vote candidate. You invoke him because if you don't invoke him, it may come back to haunt you. I know. That's your principle. Hopefully it won't. St. Jude was already brought up. I don't know if I need him or someone else. Do you have the Sherpa guy to help you with them? I don't have a Sherpa. All I got is St. Thomas Moore here. Maybe you can bust him for Mr. Alexis. Maybe I should step in and let him come in from the bullpen. But I do believe, all kidding aside, my evidence is he got that full work release. And as you said, I can throw up all this. It's a terrible decision, which I truly believe it was. The manifest weight argument is he got a full work release regardless. All the other opinions that came after, the Susan Emberg, I mean, even Goldberg didn't know what the guy testified to the first time around. All these various restrictions. I mean, he was the time and reply. Oh, excuse me. Thank you, Your Honor. Thank you. Do you have five minutes in reply? Counsel, you may respond. Counsel, if I may please the Court. I'm George Gaines on behalf of Robert Amperin. Maybe I should begin by pointing out that the opinion of Dr. Mercier back in 2008 with respect to the petitioner having reached maximum medical improvement might be relevant as to the beginning of our ability to start to analyze his permanent disability. Well, it's also relevant for the fact that I have a question. If the treating physician releases him to full duty on October 10, 2006, he's an MMI, how do you get TTD after that date? On what basis do you get it? That he's got the restrictions that prevent him from doing his regular job. Really? That doesn't get you MMI. It gets you maintenance. Well, and in addition to that, the fact that he can't find work anyplace else. It gets you maintenance. It doesn't get you MMI. It doesn't get you TTD. Well, that's true. But then it's kind of hard to tell at that point in history. Maybe this is showing some deference to counsel. Whether or not this is really headed towards a permanent disability. He didn't know that either. That's why he looked for work. But in retrospect, it's very clear. I fully agree. I mean, it occurs to me that Mercier released him to light duty work in September of, I think, 2006. Was it 2006? I think so, 2006. If we agree with you that he truly is an OGLOT permanent, the only thing that's going to happen is we're going to reverse the TTD after September of 2006 and back up the maintenance to September of 2006. And as far as Hilton is concerned, it's six of one and half a dozen of the other because it's the same amount of money. Sure. And it's just a different type. So in a way, it's a little bit academic. I understand. But you've got a couple other problems. You've got the hospital bill for the $1,363.50, which they say he shouldn't get because he testified he fell down the stairs because he tripped over a cable, not because his knee gave out. That was a different incident.  It's pretty clear he forgot. And that's why he said apples and the record's red oranges. Do you concede that? Oh, yeah. He forgot. I was sitting there thinking, Robert, you forgot. We just talked about this. You forgot. All right. So that issue's off the table. You're conceding it. I think it is. But, you know, for all the cases we've seen where so much stock has been put and the history is taken by treating doctors, frankly, I think it should apply here. I mean, it seems to be, and usually rightfully so, that if you've got a choice between believing what a witness says at trial or what the litigant's position is, well, let me put it another way. There's a lot of stock historically from evidentiary law through centuries put on the fact that doctors, clinics, they have no dog in the race. What they find is usually reliable is a presumption that when someone speaks to their doctor, they're going to tell them the truth. Their health is hanging in the balance. Right. That is the presumption. So I think it's a safe assumption to make that he, that what happened was as it was noted in those records. This time, to his benefit, I usually see it as to my client's detriment. But you get my point. And I made that my point as well. Let's not forget here, I mean, it's kind of tough sitting here hearing the argument about whether Mr. Amperin is a liar. He's testified twice before the Illinois Industrial Commission on the previous knee injury as well as the one before the court today. Both times the commission found him to be credible. Now, it's clear to me under the facts and the law that we have a compensable accident that resulted in further disability. Dr. Goldberg, that's why we went back to, that's why I insisted on going back to Dr. Goldberg, who was, I believe he was the surgeon, he was the surgeon in the previous case. Okay. And having him take another look at that same knee that he saw in the past. When he showed up to work at Hilton, when he got hired, what was his status, what was his adjudicated status by the commission? I am not entirely sure. I don't think the commission had rendered its decision at that point. From the prior employer? Right. I don't believe so. All right, so to cut to the chase, you're asking that we affirm the permanent total disability benefits, correct? Sure. TTD, that's probably up for grabs, to be honest about it. Okay. And you conceded on the medical expenses, right? Well, not entirely. I mean, if you want to, well, if you want to. We're waxing and waning. I want you to believe the doctors this time. Robert forgot. He took over the cable. Okay. All right. I think we understand the argument. What was the difference in his weight restrictions from the prior case that he had and Bush Joseph's report? Dr. Goldberg, at the conclusion of the first case, found a 30-pound lift restriction. Bush Joseph put him on a 40-pound? Right. But in the interim, Dr. Goldberg found 20. 20. And he explained how there was this stellate fracture of the cartilage, and certainly more cartilage was removed during the procedure that was performed after our case, after our injury. So he consequently found a greater disability, which, of course, is very important to all these pieces falling into place with respect to medical causal connection, a worsening of his condition, and the law supporting this recovery, despite the fact that the man already had an injury and was already adjudicated a permanent total, which, by the way, that case was settled. It didn't, it didn't, there was no final determination. Finding a permanent total, the case was ultimately settled. Yeah. I think your opponent suggested that the arbitrator found there was a permanent total, and then it was settled while it was before the commission. That's right. That's right. So we're looking at a compensable accident resulting in further disability, which prevents him from performing his regular job. And let's not forget the job at Chicago Hilton was, sorry, Hilton Chicago, was required these workers to push 1,000 pounds in a cart up to that and to lift 40 pounds, no, 50 pounds. So you have Dr. Bush Joseph finding restrictions which would prevent this man from returning to his regular job at Hilton Chicago, hence the, one of the reasons for the need for the voc rehab. Which they didn't refute anyway. They presented no evidence to refute. I'm sorry. Maybe I don't understand. I mean, I hear a lot of argument about how you can't believe Mr. Ampron's job search. But I think as we've been saying all morning, that's his opinion. Obviously, the commission believed your client and didn't present any evidence to refute that. That's right. That would be the essence of what's going on here, right? Okay. All right. Yeah, they didn't meet their burden. Right. And that's why we're seeing this permanent total here. And that's why you're asking us to affirm the commission and everything. That's right. Should I sit down now? No. It's your decision. You still have more time. All right. Well, right. The arbitrator adopted my decision. This is an arbitrator, by the way, that was elevated to the commission level. So let's not, you know, cast aspersions here and assume that, well, things were rubber-stamped or what have you. He wouldn't cast any aspersions. You know that. Not a gentleman like Mr. Noble. Of course not. Is the elevation of an arbitrator to the commission some indication of ability? Can we take judicial notice of that? Yes. We can, okay. And let's also not forget, you know, there's nothing nefarious about Mr. Amperin going back to work. It's the public policy of the State that anybody who can't. There's something nefarious about being labeled a permanent total and then telling your employer there's nothing wrong with you. Well, let's not forget that, well, the man needs to eat. We understand that the employer isn't going to hire him if he admits to what his condition is. But the fact of the matter is, you know, while you're sympathetic with the fox, you've got to be sympathetic with the hound, too. I understand, Your Honor. And, you know, that's why a couple days ago when I was thinking about this, I remember reading the Flynn case recently. That was the one where I think the man was an electrician or something, many years. And then he got a job making way less doing something else. And the court decided that they termed his electrician job severed employment. And that his earnings as an electrician should be taken into account when determining whether he has a wage loss. And I understand why there's a certain discomfort with this case. That's why Mr. Noble and I sat down with the arbitrator before we even tried the case and went over the law in detail to make sure we weren't all missing something because there was that sort of unease. But in the Flynn case, granted many different issues, there were some, there was an opinion cited by the court in there that read as follows. Fairness to the employee and fairness to the employer carrier are not symmetrical. And cannot be judged by the same standards. To this one employee, this one loss is everything. He has nothing against which to offset it. To the employer, this is just one case among many. The rule operates impartially in both directions. Today, this employer carrier may be saddled with extra cost. Tomorrow, the positions may be reversed and the employer carrier will be completely relieved of the cost of an injury to one of its employees. This is the essence of the concept of spreading the risk in a system like Bortman's Comp. So I think when looked at from that perspective, the sympathies lay properly. And I think that's why we see the case law that supports this case. Counsel, your time now is up. All right. Thank you. You may reply. I honed in on this one statement counsel made that Robert forgot. Robert forgot a lot of things. He forgot his cane on the morning of the trial until he got out of the car in front of the courthouse. I wanted to address one thing Justice Hoffman said about maintenance being owed. It would be difficult to award that maintenance benefit based on the full work release. Maintenance is only due if he's capable of returning. He had a full release to go back to work within restrictions. Entenberg testified that he might be placed in an appropriate position with his work restrictions and skills if he were given voc rehab. Without the voc rehab, she said, it's unlikely that the claimant would find an appropriate position. But are we all in agreement that he was released to full duty? With restrictions. You can't ‑‑ Bush Joseph put a 40 pounder on him. Goldberg put a 20 pounder on him. The treating surgeon said he's got to live with the arthritis. It's something I have to learn to live with. He's happy with this. He does not need any more surgery. He will continue his regular job duties and return to the clinic as needed. Yeah, exactly. 20 pound weight restriction from Goldberg and a 40 pound lifting restriction from your own doctor. So this evidence is trumped by subsequent evaluations. How about the commission gets to pick and choose what they're going to believe? Bush Joseph's evaluation was to determine, among other things, whether he was back to where he was before. The question is, did Bush Joseph say he has a 40 pound lifting restriction and should avoid repetitive squatting, kneeling or use of his left knee? Did he say that? He did. Did Goldberg say that he can go back to work, MMI as of March of 08, and perform light duty work, meaning lifting, pushing or pulling of no more than 20 pounds, pardon me, and refrain from climbing, kneeling or squatting? And he also recommended that the complainant alternate standing and sitting. Not disagreeing. Well, so you've got one guy that turns around and says he can go back to work, full duty. You've got two guys that say he can go back to work, but these are the restrictions. And if he's found to be an odd lot permanent, and because he can't get a job within his restrictions, the question becomes then, when is he entitled to maintenance? It occurs to me that he would be entitled to maintenance whenever his TTD stops or whenever he quit working. I mean, it's got to go all the way back. I don't know if it does. Well, they awarded the maintenance from the day they stopped the TTD, didn't they? Right. And from Murray's report forward. Yeah, exactly. So now the question becomes, if they're wrong on the end date of the TTD and that gets backed up, why isn't he entitled to have the maintenance pushed back? Because arguably he didn't have restrictions until Goldberg saw him in 07. Wait a minute. Wait a minute. If I can't lift 40 pounds today, does that mean I could lift it? Because the doctor says today I can't lift 40 pounds. Does that mean I could lift 40 pounds the day before? Well, again, you just hit the nail on the head. You've got three different surgeons all saying. The difference with Mercier, though, is he didn't know any of the prior history. He was told that he had a knee surgery. You've got a million reasons why the commission should have decided it your way. They didn't. And we get this all the time, and it frustrates me because you argue these cases if there's one right answer. There is no one right answer. There's evidence in favor of conclusion A, and there's evidence in favor of conclusion B. The commission chooses A. As long as there's evidence in the record to support A, they have to be affirmed. Well, there's no evidence to support maintenance is owed after he was released other than when Goldberg evaluates him, and Goldberg didn't even know about his prior testimony. None of it makes sense. He said that he conducted his job search from October of 07 to April of 09. So why would you back it back to the last day he worked for us? It's not the last day he worked. You back it up to the day he terminated his TTD because he was at MMI. All right. Well, you're hanging it. We haven't decided any history, you realize. Oh, I know. I just was trying to clarify in my mind, understand what Your Honor was saying about the maintenance being owed back to when he was at MMI. If a guy is in a permanent total in 2011 because of an injury that occurs in, let's say, 2005, are you meaning to say that he wouldn't be entitled to maintenance whenever his TTD ended from his injury in 2005 because it wasn't until the arbitrator said you're a permanent total that you get maintenance? What I'm saying, all I'm saying is that maintenance is due in owing if he's otherwise incapable of finding a job within his restrictions. He said he was. Well, that was, well. And they said we believe you. I'm not suggesting that I would have believed them, but they did. No, I understand. Thank you. Thank you, counsel, both for your arguments in this matter. This matter will be taken under advisement when this position shall issue.